D., L. & W. R. R. Co. *v.* Scranton.

THE DELAWARE, LACKAWANNA AND WESTERN RAILROAD
COMPANY

*v.*

SELDEN T. SCRANTON et al.

1. Where the owner of the equity of redemption in mortgaged lands has assigned for the benefit of his creditors, he retains such an interest that he may apply to set aside a sale of the lands under foreclosure, notwithstanding the assignment.

2. In this case, he had made no defence to the foreclosure suit, and in his petition to set aside the sale, claimed, as one ground, that the mortgage was only collateral, and that the principal security for the debt had not been resorted to or exhausted.—*Held*, that that ground was not available to him under the circumstances.

3. The object of the fourth section of the act of 1880 (*P. L. of 1880 p. 255*), is merely to prevent the sacrifice of property at foreclosure sales, so far as it may be done by requiring proof, to the satisfaction of the court, that at the sale the property brought the best price then obtainable for it at a foreclosure sale for cash. The legislature did not intend by it to authorize the court to protect the property from sacrifice by setting aside sales until an adequate price should be obtained for it.

On objections to sheriff's sale and petition to set it aside &c.

*Mr. C. Parker*, for the petitioner.

*Messrs. J. G. Shipman & Son*, for complainant.

THE CHANCELLOR.

The petitioner, Selden T. Scranton, seeks to set aside the sheriff's sale of certain tracts of land sold under the execution in this cause, and to that end has, under *Rule 208*, filed objections to the confirmation of the sales, except as to one tract, which, though it was, as he insists, sold for far less than its value, he is willing to let go, seeing that the purchaser is a large creditor of his, and has dealt with him kindly. The tracts in question are

in Warren county, and are called in the papers the Cummins, the Deats and the Reeder properties. The first is an undivided interest (one-half) in about ninety acres, and was sold for $5,000; the second is a tract of about one hundred and sixty-five acres, and was sold for $8,375, and the third is a tract of nineteen and a-half acres, and was sold for $520. The complainant was the purchaser of all of them. The petitioner insists that the first (the undivided half) is worth $25,000, the second $30,000, and the third $1,500. He gives as a reason why the sale should be set aside, that at the time of the sale the weather was almost, if not quite, the hottest of the season, and that various persons whom he requested to attend the sale, while they expressed their willingness to attend, yet declared their inability to do so; one because of sickness, and others because of the weather and their intended absence at watering-places. He further urges that the Cummins and Deats properties, in which are minerals, it is said, are likely to be greatly benefited by railroads now being constructed in their neighborhood, which will furnish valuable and necessary facilities of communication with the iron market. He also asks relief, on the ground that the mortgage was given only as collateral security, and that, in equity, no sale should be made under it until after the principal security has been exhausted. The complainant objects to the petition and moves to dismiss it, on the ground that the petitioner, who has made an assignment (made before the bill was filed) for the benefit of his creditors, has, therefore, no interest in the sales, and cannot be heard to object to them, or oppose the confirmation thereof, and insists that the sales should stand.

To dispose of the objection on the ground of want of interest: The petitioner is a party to the suit, and, under his assignment for the benefit of his creditors, has such an interest in the sale of the property as gives him a right to be heard. He is entitled to any surplus of his property assigned that may remain after the payment of his debts; and on payment of his debts before administration of his estate by the assignee, he would be entitled to a re-assignment of his property.

The objections to the sales, however, are not such as to warrant

me in withholding confirmation. The sales were conducted with great fairness. The sheriff appears to have granted the petitioner every adjournment which he asked for. When the sales were made, there was no lack of bidders, and the petitioner, who was present, complained of none; nor did he object to the sale, or ask for a postponement on any ground whatever. The time occupied in the sale appears to have been nearly three hours. The sheriff testifies that he received the execution in September, 1880; that he proceeded to advertise the land described in it; that two adjournments were granted at the request of the petitioner, and, by consent of parties, two or three more; that he sold the property and reported the sale, but understood that it was set aside on exceptions; that about the middle of April, 1881, an order directing a resale was served on him, and he immediately advertised the property to be sold on the 24th of June then next; that on that day the petitioner urgently pressed for an adjournment, but gave no particular reason therefor; that the complainants opposed it, but he granted it for four weeks, until July 22d, on which day the petitioner asked for another, which was granted and the sale adjourned to the 20th of August; that on that day the petitioner appeared and with him Mr. Charles Scranton, Mr. Moffatt, the agent of Ario Pardee, and another gentleman, named Trethaway, who was engaged in mining, and was an agent of Mr. Pardee; that there were also present, not only when the sale began, but all the afternoon, during the whole time the sale continued, Mr. Theodore Sturgis, the agent of Mr. Benjamin G. Clark, the assignee of the petitioner and of S. T. Scranton & Co., Mr. William H. Scranton, who is the nephew of the petitioner, and who has charge of the furnace and property of the assignee at Oxford, and other persons; that after due time, and at about two o'clock in the afternoon, he (the sheriff) proceeded to sell the land, beginning with the first lot; that the petitioner made no request for any adjournment, at any time, either before or during the sale, nor did he make any representation to the sheriff as to the non-attendance of any other person, or say that he had requested any one else to be present who had not come, but he appeared

to be entirely ready for the sale; that Charles Scranton bid on each of the lots; that the petitioner seemed to be interested in the bidding, and consulted with his brother and others who were present during the sale; that the sheriff was occupied all the afternoon, from shortly after two o'clock until nearly five, in selling the property; that he delayed in crying off each tract until he was satisfied that no more would be bid; that he repeatedly spoke to the petitioner and Charles Scranton, to ascertain whether they had finished bidding, and the latter would either continue to bid or say that they were through, and that neither the petitioner nor Charles Scranton, nor any one else, said anything by way of objection to the amount bid, nor did he or they say that the lots were worth more or less than the amount for which they were struck off. He further says that he took every bid that was offered that day, and that each lot was struck off and sold in the presence of all the before-mentioned persons, and that he believes that there can be no fairer sale of real estate than was then made of the property in question. He also testifies that the property was sold for the best and highest price it would bring, in cash, at the time, and there is no evidence at all to the contrary.

In this connection, it may be stated as a significant fact that the property sold to Pardee, which the petitioner values at about $50,000, was struck off to him at $26,710, subject to an encumbrance of $5,600. Before the passage of the act "concerning proceedings on bonds and mortgages given for the same indebtedness, and the foreclosure and sale of mortgaged premises thereunder" (*P. L. of 1880 p. 255*), it had been repeatedly held in this court that it would not interfere with a sale under its decree, on the ground of mere inadequacy of price, unless the price was so inadequate that the court might infer fraud from the inadequacy. *Eberhart* v. *Gilchrist, 3 Stock. 167, 170.* And the English practice of opening biddings had not been adopted by our courts, because its tendency was considered prejudicial to judicial sales. *Conover* v. *Walling, 2 McCart. 173, 178, 179.* It is urged, however, that the act of 1880, above referred to, has introduced a practice as to sales under foreclosure akin to

the English practice of opening biddings, because it makes it necessary to the validity of such sales, that they be confirmed. But that act, while it indeed makes confirmation necessary, imposes no condition, except that it must appear, by proof, that the property has been sold at the highest and best price it would bring at the time of the sale, in cash—that is, that it has brought the best price that could be got for it at the time, at sheriff's sale, for cash. The design of the legislature in requiring judicial action on every such sale, was not that, through the setting aside of sales, mortgaged property might be saved from effectual sale until an adequate price for it should have been obtained, but that those interested in having the property well sold might have opportunity to object to the sale; and if it should appear that the property had not brought the highest price it would bring at sheriff's sale, for cash, the sale might be set aside. There is no evidence that a better price could have been got for any of the properties in question. Nor is any person produced who says that if it had not been for the heat of the weather, or other impediment, he would have attended the sale, and given more; nor any one who says that, on a resale, he would give more; nor even that the property would probably bring more at another such sale, for cash. And there is not even any assurance that if the sales be set aside, the properties will bring as much on a resale. The petitioner's witnesses speak of the value of the properties, but not of what they would probably bring at sheriff's sale for cash. The railroad was in course of construction when the sale took place, and it is not yet completed. It does not appear that any new discovery as to the existence of minerals in the land, or the character of those known to be there, has been made since the sale. There is no proof at all as to the Reeder lot, except an opinion as to its value. As to the Cummins and Deats properties, Prof. Cook testifies that both of them have long been known to contain valuable deposits of iron ore.

But further, the amount due the complainant on the execution, at the time of sale, was about $400,000, and on the Deats lot there was a first mortgage, on which, at that time, there was

due about the sum of $700. The mortgagors are all insolvent, and so is the Oxford Iron Company, for whose accommodation, and as surety for which the mortgage indebtedness was, as the petitioner alleges, incurred. The value of the three tracts in question, according to the petitioner's estimate, is about $56,500. The other tract which was bought by Pardee, brought, as before mentioned, $26,710. So that if, on a resale, the property should bring the prices fixed by the petitioner, it would not pay one-quarter of the complainant's debt.

The petitioner made no defence at all in the suit. For obvious reasons, he cannot obtain relief in this proceeding on the ground that, in equity, he is entitled to have the principal security exhausted before recourse is had to his mortgage. The petition will be dismissed, and the sale confirmed, with costs.